Leslie Goldsmith Baker Donaldson UnityHealthCare Adam Zehner Co-Counsel for UnityHealthCare Angela Drawley Dorsey Whitney St. Anthony Regional Hospital Lakes RegionalHealthCare The three hospitals in these appeals are sole community or Medicare-dependent hospitals, as designated by the Secretary. They are all rural hospitals located in Iowa. The appeals that are before you are appeals of decisions of the Secretary of HHS, Health and Human Services, which were made by the CMS, Centers for Medicare and Medicaid Services Administrator. This case involves Medicare payment for a volume decrease adjustment, which I will refer to as a VDA. It's an add-on payment for certain qualifying hospitals. There are two issues in these appeals. The first is the VDA calculation methodology or the equation, and the second is the classification of certain costs as a variable or fixed. In my limited time before you, I am going to focus on the first of those issues. Before I get started with any of the substantive matters, I would like to address deference. Although cases such as these, where the court is reviewing an agency action, are generally entitled to deference, deference should not be afforded to the agency's position here for two very important reasons. I don't mean to cut you off, but I do want to focus you on what concerns me most. I would love to. And that is the law. The law passed by Congress says it may be necessary to fully compensate for the hospital fixed costs. Does it give us any guidance at all, or does it give the agency any guidance at all? It gives very little guidance. There's no way to look at that statute and say there's an equation or something we can really put into practical practice. So how, then, do we put any bounds on the department here? The department has interpreted this statute through a regulation, which also does not have a clear equation in it, but also in its manual, the Provider Reimbursement Manual, the PRM. And in that manual, it has set forth a very clear indication of how this should be interpreted and how it has interpreted this VDA calculation since the VDA statute was passed, until such time as Unity Healthcare came before it. So the reasons that deference should not be afforded here are because the secretary's position contradicts the underlying statute and because the secretary's position is contrary to his longstanding interpretation and practice for calculating the VDA. You said contradicts the statute. I thought we just said the statute didn't tell us anything. Well, the statute doesn't give us a clear equation, but the statute says that a qualifying hospital's full fixed costs must be paid for. Yeah, but as you know, first class in any business school, even in high school, they say fixed costs, variable costs. The statute doesn't say anything about variable costs, right? No, it does not, and it says the fixed costs need to be interpreted. So how can it be contradicted by about anything the secretary does? Because the secretary's calculation says that the full payments that are attributed in the calculation are both the PPS payments and the VDA payments, and if all those PPS payments and all those VDA payments add up to a hospital's fixed costs, then the hospital is made whole. However, according to the statute that sets forth the DRGs, the DRG is intended to be the cost, reasonable cost, for fixed and variable costs, its operating costs. I thought the DRGs were a perspective system that didn't necessarily relate to the hospital's actual costs by definition. They do not. They are not actual costs, but they are intended, and they are set to replicate reasonable operating costs, fixed and variable. Are they kind of an average? They are. They're set based on a particular diagnosis, but they are an average. But they are intended and calculated based on fixed and variable costs. So if the secretary allocates that full payment to fixed costs in determining if fixed costs are fully paid for, then that's contrary to the DRG statute, which says this is the reasonable amount we're going to give you for fixed and variable. So there is a case here that I believe is very similar to our case, and that's a case decided by the circuit in 1995, Shalala v. St. Paul Ramsey Medical Center. In that case, it was also a Medicare case where the secretary was trying to add a requirement to the Medicare provider reimbursement manual that just wasn't there. It involved Medicare bad debt and requirements for reimbursement of certain Medicare bad debt to providers. The PRM requirement said that the provider, the hospital, not the patient, must determine a patient's indigency for purposes of determining whether the provider gets the Medicare bad debt payment. The secretary in that case asserted that this requirement meant that the provider had to independently verify the information supplied by patients used to determine the patient's indigency. The court found there was no provision requiring the provider to independently verify the information from the patients. The question to the court there was whether the secretary's interpretation would control. And the court there acknowledged generally that substantial deference is given to the secretary in these types of cases, but it said, and I quote, even applying these exceptionally deferential standards, we nevertheless conclude that the secretary's interpretation of section 312 of the PRM to contain an unwritten but implied independent verification requirement is plainly erroneous and inconsistent with the text. In our case, it's quite similar. The secretary is reading in a requirement to the PRM that doesn't exist. They want you to say that the starting point for the VDA calculation, the operating costs equals fixed costs. That's not what operating costs means. And in fact, in the PRM, there are pages and pages where the secretary, the agency is very particular about talking about variable costs and talking about fixed costs. When it got to the calculation point, it said operating costs. It did not say fixed costs was the starting point. And the secretary invented a category called semi-fixed costs? I'm sorry? The secretary invented a category called semi-fixed costs too, right? Semi-fixed costs could be included as fixed costs. Yeah. Unless you have other questions, I'd like to reserve the balance. You certainly may. Ms. Drawley? Yes, ma'am. May it please the court. My name is Angela Drawley, and I represent Lakes Regional Healthcare and St. Anthony Regional Hospital in this appeal. I think it's important for us to realize that in this case, it's somewhat of a different procedural posture. We're not trying to invalidate the interpretation of the secretary that was set forth in the PRM that was used for 20 years before these cases were decided. And the hospitals are not challenging the new calculation method that the secretary adopted via notice and comment rulemaking in 2017. Instead, we're challenging the ad hoc interim decisions of the secretary that were substantive changes to the agency's prior longstanding interpretation of the VDA calculation method. And those changes were not the result of any change in the VDA statute or the VDA regulations, and they were not supported by any other substantial justification. I think these cases are also somewhat unique because we have two other interpretations of the same statute and the same regulation by the same agency, one before the decisions in this case and one after, to which we can actually compare the secretary's decisions in this case and test the reasonableness of the outcome. And the results of both of those other interpretations, the PRM and the 2017 regulation, clearly show that the secretary's decisions in these cases are not reasonable and therefore not afforded deference. But you like the fiscal intermediaries. They're not called MACs, right? You like their calculation, right? We either need to use the MACs calculation that followed the PRM, the secretary's written guideline, the prototypical example, it's been called, of an interpretive rule, which the MACs did, or we have another reasonable interpretation, the 2017 regulation. Both of those fit within the statutory mandate to fully compensate the hospitals for their fixed costs. The secretary's calculation does not, and here's why. But your MAC, hang on to your here's why, but your MAC, the way they calculate it, is a lot like the new regulation, right? Proportional sort of? The PRRB used the exact same method in St. Anthony that the new regulation has. The reason that we have this disparate impact when we look at the regulations and we look at the different calculation methods is because in the PRM and in the 2017 regulation, there's a balanced equation. The PRM takes total costs minus total revenue, and the 2017 regulation takes fixed costs minus fixed revenue. But the secretary has an imbalanced equation. The secretary did not subtract apples from apples. The secretary took the fixed costs minus the total revenue. And we can see this when we look at an example. In St. Anthony, it was entitled to almost $2 million under the PRM methodology that had been in place for 20 years, that it relied on, just like in St. Paul Ramsey, did exactly what was required. And under the new regulation, St. Anthony would be entitled to at least $1.6 million. But under the secretary's ad hoc method that was used in this case, St. Anthony is only awarded approximately $500,000. That's an almost $1.5 million difference in the three interpretations of the secretary over time for the same statute and the same regulation. The secretary's interpretation in this case just cannot be reasonable and should not be given deference. Well, surely we can't go by the dollars because the whole DRG system is a weird system on dollars, right? You'd agree with that. Well, the DRG system is a prospective payment, but the VDA looks at actual costs. Well, that's apples and oranges to start with. That was kind of what I was trying to say. Right, so the VDA payment is an add-on after we determine the DRG average payments. In Lake Regional, it's even a bigger difference. In Lake Regional, they were entitled to over $1 million under the PRM, but under the secretary's method, they resulted in a negative number. Both the PRM and the 2017 methods demonstrate that the DRG payments did not fully compensate Lake Regional by at least $850,000 or $1 million. But the secretary's calculation indicated that Lake Regional was overpaid by $175,000. It's not reasonable for the agency or for this court to determine that the three different methods advanced by the secretary over time can all be reasonable interpretations of the VDA statute or the regulations, especially when they have these wide-ranging results. Is disparity in results enough to find something unreasonable? Well, it certainly shows that the secretary's calculation, there's something that's not right about it. It doesn't get deference when you have inconsistent results and the secretary has used inconsistent methodologies. That is one factor that shows that the weight of the secretary's decision is not afforded deference. Very good. But the DRG case mix, to dive into that, the DRG case mix, even at one hospital over a year or two, could make a big swing in DRG payments, right? Correct, but we don't look necessarily at the DRG payments when we're looking at the VDA. The DRG payments are prospective and average, and then this is an add-on payment for certain vulnerable hospitals that can't operate in an efficient manner. DRG is based on the average hospital operating in an efficient manner, but Congress has recognized that these vulnerable hospitals can't do so when they have a decline in patient volume of 5%, so it's provided this additional help, this additional add-on payment to help. But Congress only cared about their fixed costs, right? Congress didn't care about the hospital's variable costs. Congress said the secretary shall fully compensate the fixed costs. There's only two ways to do that. Total costs minus total revenue, or fixed costs minus fixed revenue. You cannot have the imbalanced equation, or you cannot meet the statutory mandate. Well, no, wait, it doesn't say anything about the statute, it doesn't say anything about variable costs. No, but it says we have to fully compensate the fixed costs. The fixed costs, yeah. And there's only two ways to do that. And I see my time is into rebuttal. If I could reserve the remaining time, I would do that. You may, for sure. Ms. Schoen. Good morning. Excuse me. Good morning. May it please the Court, Karen Schoen on behalf of the Secretary of Health and Human Services. Excuse me, I'm sorry. Get water if you need it. Here's your judgment. Go ahead. Under the calculation method used by the secretary in these cases, plaintiffs received through a combination of their regular DRG payments and an additional payment, the volume decrease adjustment, payments that totaled their fixed costs, which is all that the statute requires. The dispute here is whether plaintiffs must also receive additional reimbursement for their variable costs. And under the method proposed by plaintiffs, they would receive dollar-for-dollar reimbursement not only of their fixed costs but of all their variable costs as well. But there's nothing in the statute that compels that result. Where do you put semi-fixed costs, what you call semi-fixed costs? I think what the secretary has explained is that those are considered on a case-by-case basis and in certain circumstances. Which ones do they end up in at crunch time? Do they end up in the variable or do they end up in the fixed? I think they often end up in fixed costs, and that's where they ended up here. There was no adjustment for, like, excess personnel costs, for example. I think all their semi-fixed costs were actually treated as fixed costs in this case. I would like to address a few things that counsel for plaintiffs mentioned. They spent a lot of time talking about the provider reimbursement manual and saying that the secretary's calculation was inconsistent with that and with the secretary's longstanding interpretation. But I think it's important to note that they point to no decision of the secretary actually adopting the method that they're advocating here. And as the board recognized, I think the reimbursement manual is ambiguous. It's not entirely clear. And it's, I think, important to note that in 2006, the board issued a decision in the Greenwood County hospital case, which is cited in our briefs and is included in the hospital's addendums, and there the board actually upheld the method used by the secretary here. Now, that board decision was not reviewed by the administrator, so that became the final decision of the secretary. And so we know at least, and that was actually in that Greenwood County hospital decision, the contractor there had used the same method that the secretary used here. So we know that there were at least some contractors using that method. The board upheld that method back in 2006, and plaintiffs have pointed to no decision of the secretary using the method that they advocate. The real complaint about you is you change the rules every 10 or 15 years. Well, it's not uncommon for agencies to revisit and refine their rules, but that doesn't make a prior rule unreasonable or unlawful. We're dealing with an ambiguous statute and lots of different ways you can imagine to interpret it. Wait, you think the statute's ambiguous? I think it is in the sense that it doesn't fully explain what it means to fully compensate fixed costs. Well, wait, it says they have to be compensated. Look, the secretary has come up with two interpretations. The secretary did issue new rules in 2017, and we think both are reasonable. And so that suggests there is some ambiguity in the statute because we have two different interpretations, both of which are reasonable. And so the fact that the secretary issued new rules in 2017 doesn't make the method used here any less reasonable. I think the secretary, and we continue to believe, that the method used in these cases was reasonable and fully consistent with the statute, as is the new method in the 2017 rules. Go ahead. If you were a hospital, do you think what the secretary has done here is a fair interpretation for them in terms of the costs that they have and their mission that they have in their communities? Yes, Your Honor. I mean, what the statute requires is that their fixed costs be fully compensated, and they received payments... But they're contending that the secretary's analysis or approach doesn't do that. Well, it does, Your Honor, because they did receive payments totaling their fixed costs. They got their regular DRG payment, which... DRG. Tell me what that is. DRG payment is shorthand for... Now I'm picking on the diagnostic-related group. Go ahead. And so it's a payment made under the prospective payment system whereby hospitals receive a fixed amount for treating a patient depending on that patient's diagnosis. So someone, for example, who's in the hospital for heart surgery, the hospital gets higher compensation than someone who comes in with a simple broken arm, for example. It has no relationship to actual costs. No relationship to actual costs. It's paid in advance to squeeze hospitals to do things quickly and vastly efficiently. Exactly, exactly. And it was based, you know, when the prospective payment system was first implemented, basically the agency took an average of costs per patient across hospitals across the country. Who establishes these DRGs? That's the agency does that. Each year the agency does that. And there are adjustments... The DRG takes into account sort of the complexity of a diagnosis. So the starting point is average costs dating back to sometime in the 80s when the prospective payment system was first implemented. Those average costs per patient are sort of inflation-adjusted each year. And then there are additional adjustments, weighting factors, depending on the severity of the diagnosis so that you get more payment for a more serious diagnosis and less payment for something like a simple broken arm. There are also additional adjustments for labor costs in a particular market. So there are a whole bunch of adjustments. It's a very complex calculation and determination that's made each year. But I think the key point for purposes of our case is that it is a fixed amount determined independently of a particular hospital's actual costs in treating a patient. So this is just a set amount that each hospital receives. So you contend that it's an actual cost that they have incurred. Is that right? So the DRG payment is not intended to compensate a hospital's actual costs. It's a predetermined amount that Congress has determined hospitals will get a fixed amount for treating patients. They're no longer reimbursed for their actual costs. Congress wasn't completely happy with that because they said it really hurt rural and community hospitals. So that's what they did this system for. Exactly. And the point is not necessarily to make hospitals whole and to reimburse all their costs. The point is just to partially mitigate the effect of the prospective payment system and give these hospitals a little extra cushion by making sure that at a minimum their fixed costs are fully compensated. So they stay there as hospitals. Exactly, so that they can keep the doors open and continue serving patients. So this sort of experience of an unexpected decrease in patients. There's no question that was Congress's intent, right? That's right. I want to go back to your ambiguity of the statute statement. Is it in fact your contention that the statute is ambiguous because it fails to set forth with precision a formula or methodology for determination of the VDA? I think that's right, Your Honor. All right, now if that's true. And if in fact at that point, now it's ambiguous and now the hallmark of the entire analysis is reasonableness. And the purpose of the statute, the purpose of the act, is to afford sort of a leveling of losses for hospitals when they find themselves in this instance. And these are hospitals primarily in underserved rural areas. And frankly, these hospitals may not be representative of all the hospitals that may actually be at issue here because there may be very small community hospitals with one doctor that they lose their doctor and all of a sudden they have no revenue for some period of time, right? And those places still exist in rural places in our circuit, right? Now, if that's the case, the hallmark of the analysis must necessarily be reasonableness. And if in fact reasonableness is the hallmark, how can these wildly varying outcomes based on the separate methodologies be appropriate under these circumstances? Well, I think, Your Honor, just in terms of reasonableness, here what the statute does require is that fixed costs be fully compensated. And here the hospitals received payments totaling their fixed costs. So I think that is reasonable. The fact that there may be some other methods that provide more compensation doesn't make this any less reasonable because their fixed costs have been fully compensated. You know, I mean, one of the things that counsel for the hospitals noted is that under the 2017 rules, for example, the method used by the board in St. Anthony, that hospital would have received additional reimbursement. And again, obviously we think the 2017 rules are reasonable, but I think the issue there is the fact that the secretary chose a more generous method or a compensation method that may be more generous in certain circumstances doesn't mean that the method used here is not reasonable. Because again, I think it's important to keep in mind that all of their fixed costs were fully compensated here, and that is what the statute requires. Well, fixed costs do not necessarily, well, do not encompass improvements that are necessary and other things above this just flat fixed cost thing. And does your approach take that into consideration at all? No, Your Honor, again, because the statute doesn't speak to that. All the statute requires is that in this particular circumstance where hospitals have experienced a significant decrease in patient volume, all the statute requires is that their fixed costs be fully compensated. Describe the fixed costs. Well, fixed costs are things like rent, interest expense, things that the hospital will incur regardless of whether it actually treats any patients. Even if it had no patients, you're supposed to reimburse them for the fixed costs, right? That's right. You agree with that. Exactly. And they were reimbursed for their fixed costs here. Do you read anything that says the fixed costs it incurs? Do you think that means in the past, the present, or the future? I think it's in the cost year at issue for which the hospital is receiving. Well, it's present tense. It incurs. And the DRG is a forward-looking system. Do you think it's the fixed costs in years that you're going to pay DRG payments for? The rest of the statute is a DRG system, as you know, a perspective system. Why isn't this perspective too? Well, I think the perspective payment system is perspective in the sense that it's a fixed amount regardless of your actual costs, but reimbursement decisions are still made for a particular year for a cost period. So I think all we're looking at, for example, is 2006 or 2009 and the particular costs that the hospital incurred in that year, and that's the same year in which the hospital experienced the decrease in patients. So we're just looking at a particular year. I think the statute is ambiguous about what period of time it's even talking about. No, Your Honor. You don't think so at all? No. I thought you told us the statute was ambiguous. Well, I think it's ambiguous in the sense that there can be more than one reasonable way of calculating the volume decrease adjustment. Why does that also mean it's reasonable? It refers to a different period. I'm not sure I have a good answer for that, Your Honor. I don't think there's any dispute here that we're just dealing with a particular cost year. Are you really certain that what we're dealing with here is an ambiguous statute rather than a statute that simply delegates to the secretary? I mean, the statute itself may be plain, but it delegates the decisional authority to the secretary and the people that the secretary designates in the process to establish the VDA. Is that really ambiguous? I mean, it seems to me the statute on face may be plain, but the ambiguity that you're describing is really a methodology, which is part of the delegation. Now, that may be lawful or unlawful, depending on whether the statute itself provides sufficient guidance, and I think that's one of the arguments being made here, is that there is insufficient guidance, and therefore the secretary has adopted a wide spectrum of methodologies to effectuate an end that's apparently desirable today but maybe not tomorrow, and they're saying that whatever that is, that can't be right. Am I missing something here completely? No, I think that's right, and maybe ambiguous was not the best choice of words. I think the point is, and what I was really trying to say, is that the statute leaves a lot of this up to the secretary's discretion, as you said, and it doesn't set forth a method for calculating the volume decrease adjustment but leaves that to the secretary to determine, and I think the point that I'd like to emphasize is that the way the secretary calculated the volume decrease adjustment, that additional payment in these cases was reasonable and fully consistent with the statute. Do you agree you have to go by the provider review manual? Reimbursement manual. I think the manual is meant to provide guidance to contractors to ensure that the statute and regulations are applied in a consistent manner across the country. It's not something that's binding on the secretary. You give somebody an example of how to do it. They follow the example, and you're directing your contractors to doing it. Most people will do it that way, and yet you say it's not the way to do it. Well, I think even as the board recognized, I think it was ambiguous because you have the calculation, the example that's set forth, the numerical example, but then when you read the text, they talk about variable costs and semi-fixed costs, and they say the adjustment amount is not to exceed the difference between total costs and the DRG payment, and so when you put all of that together, I think it's not entirely clear. But not to exceed those in your regulation, right? Exactly. Yeah, that's beyond the PRM. That's the same language in the regulation, and again, the regulation itself doesn't set forth a formula for calculating the volume decrease adjustment. It just sort of provides the parameters or guidelines for doing that and sets a cap or a ceiling beyond which payments can exceed, but it doesn't actually set forth a formula. That regulation says you're supposed to consider hospitals' individual needs and circumstances. Do you do that in any way, the way you've got it set up? Well, I do, and I think part of that, for example, is considering whether... Tell me what part considers that. It looks pretty formulaic to me. Go ahead. Well, I'm not sure. I hope this is addressing your question. I'm not sure I fully understand it, but I think one of the ways in which that's taken into account, for example, is with staffing needs, and a contractor will look to see whether there's excess staffing or whether the staffing, for example, even in the face of lower patients, a hospital may not be able to reduce its staffing because there may be minimum agency requirements. I can call a core staff amount a fixed cost. Exactly, exactly, and I think that takes into account a particular hospital's needs and circumstances. Is that in this case? Do any of these providers have this? In this case, all of their personnel costs were treated as fixed costs. Is there any way that these current interpretations is an example of the secretary responding to pressure by Congress to cut the budget, to hold the budget down? Is there any aspect of that involved in this dispute? I don't think so, Your Honor. I mean, I think all the secretary was doing was interpreting the language of the statute, which requires that fixed costs be fully compensated. Which is going to use less of his budget if we affirm this, isn't that right? That's right. And this was just something the secretary thought of on his own and decided to proceed with? I'm sorry, I'm not sure I understand your question, Your Honor. Well, you said there was no outside reasons that we are dealing with these modifications, that the hospitals are screaming you're taking our livelihood away from us because you've cut the money that we receive from the taxpayers. So I think the method that the secretary used here was just interpreting the statute, requiring that hospitals receive payments, fully compensating them for their fixed costs, which is what they did. I think it's worth noting that the method that the secretary used here was actually a method that the board had upheld in a 2006 decision, so this isn't like some brand-new method that the secretary just pulled out of Congress. Out of thin air. I hope that addresses your question, Your Honor. I guess. If there are no further questions, then we'd ask that you affirm the judgments below. Thank you. Thank you. Rebuttal? I assume Ms. Goldsmith is going first. Sure. So just very briefly, I would like to make a comment on the Greenwood case brought up by Ms. Schoen. She said that the Greenwood case was evidence that the contractor had used this methodology, which we are protesting in the past, but that's not what happened at the Greenwood case. In the Greenwood case, the contractor, the MAC, had disallowed any VDA payment, so there was no calculation of the VDA in that case until the Provider Reimbursement Review Board implemented one. I'd also like to address the evidence that this is a change in the methodology by the secretary. The secretary's interpretation was adopted by the secretary's agent, the MAC here in this case, for the first time by this MAC when it determined Unity's VDA for the year under appeal. The MAC made that very clear in its testimony, and we've addressed that beginning on page 30 of our principal brief. Up until then, it had consistently used the method that the hospitals are advocating in this appeal. The MAC further testified that it adopted this change in methodology without any change in the statute, regulation, or PRM, that it did not rely on the Greenwood case, but that it looked at the statute and said, we need to interpret this differently, and we're going to do it starting with Unity. Why do you suppose that happened? The secretary woke up one day and said, we've got to do some different things here? The testimony of the MAC representative was that it did that because it had received an increasing number of VDA requests, and so, of course, when something is taking more money, you start focusing your efforts on it. There's additional evidence that the secretary changed his interpretation of this methodology. First, there's a letter from CMS dated 2004 where CMS was asked, which methodology do we use? And it's basically the providers versus the methodology the secretary uses here. And CMS wrote in that letter, and it's in evidence, it's in our principal brief, that the method to be used is the method that is being advocated by the hospitals in this case. This is the method in the PRM. But it didn't mention the so-called proportional method, right? No, it didn't. The first time we see that is in the board's decision in the Greenwood case. Thank you. Go ahead. And the other example of the secretary using the old method up until the point here with Unity was two Federal Register discussions in 2006 and 2008, which are in our brief, where they clearly set forth the calculation. The adjustment amount is determined by subtracting the second-year DRG payment from the lesser of the second-year costs minus any adjustment for excess staff or the previous year's cost multiplied by an update factor. With that, we would ask that you reverse the secretary's determination as arbitrary and capricious and support the recommendation of the provider hospitals. Thank you. Thank you. Ms. Trawley. May it please the Court. Proceed. The secretary suggested in her argument that the 2017 methodology was chosen to be more generous, but the statements in the Federal Register actually contradict that. They say that the change was made to remove any conceivable possibility that a hospital that qualifies for this volume decrease adjustment could ever be less than fully compensated for its fixed costs. So that means, under the secretary's decisions and the methodology used in this case, that it was possible, and in fact it was certain in these cases on appeal, that the secretary's method did not ensure that the hospitals were compensated for their fixed costs, and therefore the secretary's methodology does not meet the statutory mandate, and that means it must be vacated by this Court. Does the secretary's new methodology primarily hit the small rural hospitals, or is it across the board, the big ones and the little ones? The volume decrease adjustment basically is meant to help the small rural hospitals that are vulnerable and that can't operate in a cost-efficient manner when they lose a 5% decrease in their inpatient volume. So while the DRG payments act on all hospitals, the VDA mostly acts on small rural hospitals because those are the ones that are suffering declines and those are the ones that aren't able to compensate for that decline and act in an efficient manner like the DRG payments require them to do because they don't have enough volume to make up for that loss. I see. Thank you. The secretary also wanted you to know that they thought that both the 2017 regulation and the secretary's decision in this case were both reasonable, but that just can't be possible given these disparate results. It is true that in the August 14, 2017 Federal Register, the secretary said it continues to believe that both are reasonable. That is a completely self-serving proclamation that this Court is not required to accept because when the calculations are used, are compared, and we look at the results, it's simply not reasonable. According to the Supreme Court in Baltimore v. Aberdeen in 1968, if this Court accepted an agency finding simply because the agency said it was so, the administrative expertise would then be on its way to becoming a monster. So that was pre-Chevron, right? It's still the same. How are you sure? If you look at an agency finding just because it says so, this Court doesn't just rubber stamp the secretary's decision. It's required to make, even after Chevron, a searching, in-depth, probing review. And the secretary's decisions in these cases simply cannot withstand that searching, in-depth review. Now, we also talked about the ambiguity a bit of the regulations. And I think it's important to note that certain items in the secretary's own regulation have to be considered for the VDA. And someone started to hit on this, the individual hospital's needs and circumstances, the hospital's fixed and semi-fixed costs, and the length of time that the hospital experienced a decrease in utilization. They claim, and they're probably not right, the government. The government says, though, that's mostly for core staff, and it is mostly for core staff. Is it true that the hospitals here got all their personnel costs as fixed costs? I'm not sure that they got all of their personnel costs as fixed, but that wasn't an issue when we looked at the VDA regulation. They did not have to remove those for the VDA. In the VDA regulation – I think you're telling me they did get all personnel, some of which is definitely variable. But you're telling me that they did consider all personnel costs as fixed costs. In the PRM, there's a separate equation that you use to take out fixed costs, and that was not an issue in this case. So either the MAC decided that none of those were unreasonable, or they got all their fixed. I think it could be either way in this case. And I see my time is up, so I ask this court to vacate the secretary's decision. Thank you all for your capable argument. Appreciate it. Case number – in fact, there are three case numbers. 18-1316, 18-1703, and 18-1704 are all submitted for decision by the court. Thank you.